IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

SHERRY JORGENSON,              )
                               )
           Plaintiff,          )
                               )
vs.                            )    Case No. 08-3065-CV-S-ODS
                               )
MICHAEL J. ASTRUE,             )
Commissioner of Social Security, )
                               )
           Defendant.          )

## ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION DENYING BENEFITS

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying her application for disability benefits under Title II. The Commissioner's decision is affirmed.

## I. BACKGROUND

Plaintiff was born in November 1953, has a high school education, and has prior work experience as a "pricing clerk," pharmacy technician, sales clerk, cashier, and deli worker. She alleges she became disabled on May 1, 2003, due to a combination of maladies including depression, fibromyalgia, pancreatitis, anxiety disorder, and carpal tunnel syndrome. Plaintiff has a rather extensive medical history, and what follows is a summary of the significant aspects of that history. Gaps in the history do not necessarily indicate Plaintiff had no doctor visits in the time period in question, but that nothing from those visits is of such significance that it must be included to make this summary accurate or comprehensible.

Plaintiff began seeing Dr. Mark Jarek (a rheumatologist) in May 1999, following a hospital admission for chest pain. The pain was resolved, and Dr. Jarek diagnosed Plaintiff as suffering from depression, anxiety, and a history of alcohol abuse. R. at 582. She returned in June complaining of "diffuse myalgias and arthalgias" and Dr. Jarek

noted she had a "history of fibromyalgia a number of years ago but recently has not been treated." He determined she suffered from soft tissue rheumatism and provided medication. Plaintiff declined to accept information or guidance regarding fibromyalgia. R. at 580-81. Dr. Jarek continued treating Plaintiff, and while medications were changed at various times Plaintiff's condition did not change significantly. Through this time Plaintiff was employed and active.

In January 2003, Plaintiff was diagnosed as suffering from ventricular tachycardia, and a defibrilator was implanted by Dr. Keesag Baron. R. at 146-51, 158-60. On February 10, Dr. Baron noted the system was "working well." R. at 470. Later that month, Plaintiff's cardiologist (Dr. Raymond Rosario) determined Plaintiff had "some symptomatic hypotension with the current medication regimen" and altered her medication. R. at 466-67. Plaintiff also saw Dr. Jarek, who refilled her Darvocet for fibromyalgia. He noted Plaintiff had a "[h]istory of pancreatitis, resolved" and a "[h]istory of alcohol use, currently recovering alcoholic." R. at 468-69. Plaintiff returned to Dr. Rosario in April, but nothing of significance was reported. R. at 464-65. On May 28 (nearly four weeks after Plaintiff's alleged onset date), Dr. Rosario described Plaintiff's cardiologic condition as "doing well" and "stable" and changed her medication. R. at 456-60.

Plaintiff saw Dr. Jarek on June 12, reporting that she "ha[d] returned to drinking and is drinking vodka, occasionally binge drinking straight. She is complaining of increasing anxiety and depression." She had not been taking the Xanax Dr. Jarek prescribed, and rejected suggestions for both in-patient and out-patient alcohol rehabilitation. Dr. Jarek completed paperwork to allow Plaintiff to take a leave of absence from her work and "strongly encouraged her to consider an out-patient referral." R. at 453-54. One week later, Plaintiff was hospitalized with "acute pancreatitis secondary to alcohol abuse . . . ." Plaintiff demonstrated delusions, which resolved once she finished detoxing. By the time of her discharge on June 22, Plaintiff's pancreatitis was resolved and her prognosis was "good if she is able to remain abstinent from alcohol." R. at 178-79. Approximately three weeks later Plaintiff enrolled in an out-patient alcohol treatment program. R. at 251-54. She completed the program

2

in mid-July; testing ascertained Plaintiff was "experiencing distress at very high levels," indicating treatment was required. Her depression was "clinically significant and quite high." R. at 720. Her GAF score was 54 and she was to go to AA. R. at 249-50. On July 25, Dr. Jarek again noted Plaintiff's pancreatitis was "resolved." R. at 450-51.

On October 9, 2003, Plaintiff complained of headaches that had persisted for three weeks. A CT scan revealed no abnormalities. R. at 440-43. In March 2004, Plaintiff saw neurologist R. Scott Duff on a referral from Dr. Jarek. Dr. Duff indicated Plaintiff described migraines and arranged for another CT scan, which was normal. R. at 432. He prescribed medication. In April, Plaintiff reported the headaches' intensity had increased, and Dr. Duff changed the prescription. Plaintiff also described symptoms in her hand that caused Dr. Duff to believe Plaintiff had carpal tunnel syndrome. R. at 429.[1] Dr. Duff performed a nerve conduction test; the results were normal and he concluded Plaintiff's hand pain was related to her fibromyalgia.

On March 21, 2005, Plaintiff saw Dr. Jarek for a variety of ailments. He noted Plaintiff's "anxiety is becoming more problematic. She does have a prescription for Xanax but she is afraid to take this due to her concerns about addiction. . . . Her sleep quality is 'so-so.'" Plaintiff had recently been prescribed medication to control chronic diarrhea, and she told Dr. Jarek the medication had helped and that she no longer experienced diarrhea at night. She complained of headaches, memory loss, and wrist numbness that were not "related to any specific activity" and she retained "good use of her hands and no problems with activities of daily living." Plaintiff asked Dr. Jarek to complete a medical source statement in connection with her recently-filed application for disability benefits; while "[d]ifficulty accurately filling this out was discussed with the patient" Dr. Jarek agreed to fill out the forms. On his treatment record, Dr. Jarek indicated Plaintiff suffered from depression, anxiety, a history of migraines, and irritable bowel resulting from alcohol-related pancreatitis. He changed Plaintiff's medication for

---

[1]Plaintiff had been diagnosed with carpal tunnel syndrome in the past, and had undergone nerve release surgery.

3

depression and provided her with wrist splints.  Plaintiff declined to undergo psychological testing.  R. at 384-85.

The Medical Source Statement ("MSS") completed by Dr. Jarek is dated April 4, 2005, and indicates Plaintiff could lift ten pounds frequently and twenty pounds occasionally, stand or walk forty-five minutes continuously and four hours total in an eight hour day, sit continuously for one hour and four hours total in an eight hour day, and could never climb or crawl and only occasionally stoop, kneel or crouch.  He indicated Plaintiff could frequently reach, handle or use her fingers.  The MSS also indicates Plaintiff could experience a "possible decrease in concentration."  R. at 327.

Meanwhile, Dr. Eva Wilson conducted a consultative examination on March 29, 2005.  Plaintiff told Dr. Wilson she experienced recurring depression since approximately 1973, was in chronic pain due to fibromyalgia, felt she was often on the verge of a nervous breakdown, and experienced panic attacks at unpredictable times.  Dr. Wilson concluded Plaintiff was "suffering from major depression, recurrent, without psychotic features.  This is probably exacerbated by her fibromyalgia.  She also complains of memory problems, although they were not evidence today with the exception of the fact that she could not remember some of the questions that I asked her."  Dr. Wilson opined Plaintiff could understand and remember simple or semicomplex instructions, but probably not complex instructions.  She also indicated Plaintiff would benefit from therapy and assessed Plaintiff's GAF score at 60.  R. at 322-25.

In early April, Dr. Kenneth Bowles completed a mental residual functional capacity assessment based upon his review of Plaintiff's records.  He concluded Plaintiff is moderately limited in her ability to understand, remember and carry out detailed instructions, interact appropriately with the general public, and get along with coworkers without distracting them.  R. at 328-31.  In the accompanying Psychiatric Review Technique Form, Dr. Bowles indicated he gave full weight to Dr. Wilson's opinion because there was no conflicting evidence in Plaintiff's records.  R. at 344.  Nonetheless, with moderate limitations in only two areas of functionality (maintaining

4

social functioning and maintaining concentration, persistence and pace), Dr. Bowles concluded Plaintiff's condition did not meet or equal a listed impairment. R. at 332-45.

On April 13, 2005 (after Dr. Bowles completed the aforementioned forms), Plaintiff began seeing Dr. Cheryl List, a psychologist. Plaintiff told Dr. List she experienced pancreatitis, anxiety attacks and depression and could not work due to fibromyalgia. She reported socializing with people she met at AA and going to flea markets and antique malls. Plaintiff also told Dr. List she had memory problems, but Dr. List "did not formally assess her memory and did not observe any evidence of impairment in memory during this evaluation." Dr. List determined Plaintiff's GAF was 57 and recommended individual therapy. R. at 866-69. Plaintiff had nine therapy sessions with Dr. List, the last one on August 22, 2005. Dr. List's notes from these sessions reveal Plaintiff was experiencing stress stemming mostly from marital problems, including changes in her life that caused her to ask her husband for a divorce and her ensuing indecisiveness over whether to follow through on that request. R. at 857-65.

On May 5, Plaintiff returned to Dr. Duff for a follow-up regarding her migraines. A CT scan was normal, as were all other tests. Dr. Duff maintained his diagnosis of migraine headaches and altered Plaintiff's medication. R. at 357-59. On that same day, she saw Dr. Jarek who noted Plaintiff was not in acute distress. R. at 349.

Meanwhile, diagnostic testing revealed Plaintiff had a dilated bile duct, and she saw a gastroenterologist (Dr. Sanjay Havaldar) on May 6. Dr. Havaldar noted Plaintiff had been taking "pancreatic enzymes with resolution of her diarrhea." He recommended Plaintiff undergo further testing. R. at 351-55. Those tests revealed what was already known: Plaintiff suffered from chronic pancreatitis and had a dilation in her bile duct. R. at 853. On July 13, Plaintiff reported her diarrhea was controlled during the day with medication, but she had problems with incontinence at night. Increasing doses of medication helped resolve this problem. R. at 565-66.

On September 30, 2005, Plaintiff was admitted to the hospital complaining of chest pains. She underwent a cardiac catheterization that revealed nonobstructive

5

coronary artery disease.[2] Ultrasound revealed normal liver, spleen and pancreas, although Plaintiff's liver enzymes were high. The enzyme levels decreased when Plaintiff's medications were changed. On January 25, 2006, Plaintiff reported that her chronic diarrhea was stable, and the general tenor of Dr. Jarek notes indicates Plaintiff's problems were diminishing and that her attitude was improving. R. at 546-47. On December 6, 2006, Plaintiff saw a psychiatrist (Dr. Phyll Zuberi) to obtain antidepressants. Her depression had increased because she had not been taking her medication. She also disclosed that her memory problems had gotten better. R. at 872-74.

The hearing was held on January 30, 2007. Plaintiff testified she had memory problems since 1994, and these problems interfered with her work. Her memory had improved since she remained sober, but she still tended to forget things like appointments. She has difficulty focusing and concentrating. These difficulties increase her anxiety. Pressure situations also increase her anxiety. R. at 910-14. With regard to her pancreatitis and related problems, Plaintiff must avoid fatty foods. She believes stress also causes bouts of pancreatitis, and has four to five serious bouts per year. Plaintiff testified she stays near a restroom because of diarrhea, and that she has serious bouts three to four times per month. R. at 917. Her ailments and stress cause her to be depressed. R. at 918-21.

When asked to evaluate her physical capabilities, Plaintiff never really offered any restrictions on her ability to sit. She testified that she gets restless, but nothing further was said. She estimated that she could have stood for two hours at a time in May of 2003, and for forty-five minutes at the time of the hearing. R. at 923-25. Plaintiff testified that her fibromyalgia causes her hands to hurt when she uses them a lot (such as when washing dishes). She aches and is fatigued and has few days without

---

[2]It should be noted that Plaintiff smoked until the middle of 2006. Unsurprisingly, this was contrary to her doctors' instructions, particularly after the implantation of the defibrilator. These instructions were repeated continuously, including particularly on every occasion in which Plaintiff complained of chest pain.

6

symptoms. Most days – four days out of the week – she spends the entire day lying down. R. at 926-29.

A vocational expert ("VE") was testified in response to hypothetical questions. The first hypothetical assumed a person of Plaintiff's age, education and experience who was limited in a manner consistent with Plaintiff's testimony. The VE testified such a person could not work because of the need to lie down for an entire day four days out of the week. R. at 933. The second hypothetical changed the limitations so they were consistent with Dr. Jarek's MSS. The VE testified such a person could return to their prior job as a pricing clerk, but not to any other former jobs because those jobs required more standing than allowed in the hypothetical. Upon further questioning, the VE testified the person could still work as a pricing clerk even if pain precluded them from "sustain[ing] a high level of concentration such as sustained precision or attention to detail . . . ." R. at 934. However, if the impaired concentration meant the person could not sustain even a simple routine, the person could not work. R. at 935. The ALJ then asked the VE to assume the limitations described in Dr. Wilson's report, and the VE testified such a person could work as a pricing clerk. R. at 935-36. Plaintiff's counsel asked whether a person who "also had a limit to occasional fine fingering or handling" could work as a pricing clerk, and the VE answered in the negative. R. at 936.

The ALJ found Plaintiff had the following severe impairments: depression, alcohol dependence (in remission), anxiety/panic disorder, fibromyalgia, chronic obstructive pulmonary disease, pancreatitis, mild cardiomyopathy, and tachycardia. R. at 15. The ALJ discussed the reports from Plaintiff's doctors and noted that, in the main, they indicated Plaintiff's health problems were controlled. R. at 16-19. With respect to Plaintiff's subjective complaints of pain and fatigue, the ALJ detailed Plaintiff's daily activities and noted her statements, "together with her hearing testimony and her statements to Dr. Zuberi, show that she engages in a fairly normal range of activities." R. at 20. The ALJ also noted the medical data did not support the degree of debilitation Plaintiff alleged. R. at 21. The ALJ concluded Plaintiff was limited in a manner consistent with Dr. Jarek's MSS and Dr. Bowles PERT (which was based on Dr.

7

Wilson's examination). The ALJ relied on the VE's testimony to conclude Plaintiff could return to her prior work as a pricing clerk.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

### A. Non-Severe Impairments

Plaintiff first argues the ALJ erred in failing to identify certain impairments as "severe." An impairment is severe if it imposes more than minimal or slight limitations on the claimant's ability to work. E.g., Warren v. Shalala, 29 F.3d 1287, 1291 (8th Cir. 1994). All severe impairments must be considered in evaluating a claimant's functional capacity.

### *1. Carpal Tunnel Syndrome*

While Plaintiff was previously diagnosed with carpal tunnel syndrome and underwent nerve release surgery, the Record does not demonstrate this condition

8

imposes more than minimal or slight limitations.  The nerve conduction tests performed by Dr. Duff were normal, causing him to opine that the problems in her hands were related to fibromyalgia, not carpal tunnel syndrome.  None of Plaintiff's doctors attributed any medical issues or limitations attributable to carpal tunnel syndrome in addition to those already identified in connection with her fibromyalgia.  For her part, Plaintiff does not identify any medical evidence that would contradict this conclusion.  The ALJ was justified in relying on the evidence in the Record and concluding Plaintiff did not have any limitations specifically and solely attributable to carpal tunnel syndrome.[3]

### 2.  Migraine Headaches

Plaintiff complains the ALJ failed to identify her migraine headaches as a severe impairment.  While it is true that Plaintiff suffered from migraine headaches, there is no evidence allowing the ALJ to conclude they were severe.  Plaintiff was receiving treatment for the migraines, but there is nothing to indicate that the treatment failed to alleviate the problem.  Indeed, Plaintiff did not even mention migraines in her testimony.  There is no evidence about the frequency, duration, or intensity of the headaches, so the ALJ could not conclude they imposed a severe limitation on Plaintiff's functional abilities.

### 3.  Pancreatitis

Plaintiff faults the ALJ for characterizing her pancreatitis as "acute" instead of "chronic."  This mistake allegedly obscures the fact that Plaintiff's pancreatitis is recurring and prevented the ALJ from considering her need to remain near a restroom

---

[3]Ultimately, this is a non-issue.  The ALJ, in accordance with Dr. Jarek's MSS, found Plaintiff was limited to a degree in the use of her hands.  In the final analysis, it does not matter whether those limitations were caused by carpal tunnel syndrome, fibromyalgia, or both.

9

in the event of an unexpected bout of diarrhea. The difference in terms seems rather minor and alone is not a basis for reversal. E.g., Owen v. Astrue, 551 F.3d 792, 801 (8th Cir. 2008) (deficiency in opinion-writing is that has no bearing on outcome does not require reversal). Plaintiff's medical records demonstrate her diarrhea is effectively controlled with medication, and her testimony confirmed this fact. Plaintiff said she stays near a restroom in case an episode strikes, but she has only three to four such incidents a year. This hardly qualifies as a severe impairment.

### B. Plaintiff's Credibility and Residual Functional Capacity

Plaintiff contends the ALJ improperly discounted her testimony and failed to properly assess her residual functional capacity. These arguments are related and will be addressed together.

The familiar standard for analyzing a claimant's subjective complaints is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
>    1. The claimant's daily activities;
>    2. the duration, frequency and intensity of the pain
>    3. precipitating and aggravating factors;

10

> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

739 F.2d at 1322. Plaintiff contends the ALJ improperly focused on the lack of medical support and her daily activities. As to the latter, Plaintiff does not dispute that she engages in a wide range of activities, but contends the ALJ failed to account for the fact that she does not vacuum and goes shopping only every two weeks. To be perfectly precise, Plaintiff did not say she was incapable of vacuuming or shopping more often. Regardless, on the whole the ALJ's characterization of Plaintiff's activities is supported by the Record. More importantly, however, the ALJ's assessment of Plaintiff's credibility is supported by the medical records in a variety of respects. First, as Plaintiff concedes, most of her conditions improved once she stopped drinking. While they still persist, her condition improved markedly. Second, nothing in the records suggests a medical basis for the degree of limitation Plaintiff now alleges. Third, Plaintiff did not report this degree of limitation to her treating physicians, nor did they suggest she is this limited. As is often the case, the question is not *whether* a claimant has a condition or experiences pain, but rather the extent of limitations or degree of pain that result. E.g., House v. Shalala, 34 F.3d 691, 694 (8th Cir.1994). For instance, while there is no doubt Plaintiff still suffers from pancreatitis, this does not automatically dictate a finding of disability. The question is how Plaintiff's ability to function is limited by pancreatitis – and in this case, the Record supports the ALJ's conclusions.

This leads to the larger issue of Plaintiff's residual functional capacity. Plaintiff contends Dr. Jarek's opinions are entitled to controlling weight. The Record reveals the ALJ adopted Dr. Jarek's opinions – so it is not clear where the alleged error lies. Plaintiff faults the ALJ for relying on Dr. Wilson's consultative opinion instead of Dr. Zuberi's. In particular, Plaintiff points to Dr. Zuberi's determination her GAF score was 50. Assuming Dr. Zuberi can be considered a treating physician (given that he

apparently saw Plaintiff on only one occasion) – he saw her at a time when she had not been taking her antidepressants. Nothing in Dr. Zuberi's records suggests Plaintiff's mental condition is any more limiting.[4]

The ALJ's conclusions about Plaintiff's credibility are supported by the Record. Similarly, the ALJ's findings regarding Plaintiff's residual functional capacity are supported by substantial evidence.

### C. Ability to Perform Work

The ALJ ended his analysis at step four of the five step analytical framework after concluding Plaintiff could return to her past job as a pricing clerk. Plaintiff contends this conclusion was flawed because the ALJ did not make findings about the demands of her prior work and the VE's testimony was wrong.

Plaintiff described the job in question as taking tags that had been removed from clothing and feeding them into a machine that read information from the tags. Data entry was not required. R. at 903. The VE said this job "was most closely related to a pricing clerk's position" and provided reference number 216.482-030. This job title is for "Laundry Pricing Clerk" and describes the position as "[c]omput[ing] cost of customers' laundry by pricing each item on customers' lists, using adding machine, calculating machine, or comptometer. May keep inventory of customers' laundered articles. May prepare statements to be sent to customers." The VE said Plaintiff performed her job at the sedentary level and the job was semi-skilled, and the job is generally regarded as sedentary. R. at 932.

There is no question Plaintiff did not perform the pricing clerk job as described in the DOT, if only because she was not required to use an adding machine or otherwise

---

[4]It should also be noted that (1) Dr. List did not suggest Plaintiff's functional capacity was limited in any way, and moreover established that most of Plaintiff's stress resulted from choices Plaintiff made or was contemplating with respect to her marriage, and (2) Plaintiff rejected Dr. Jarek's recommendation that she undergo psychological testing.

12

enter data. It is unfair to say the comparison is unwarranted however: the VE testified Plaintiff's job was similar to the listing (implying it was the closest match), and Plaintiff has not – either now or at the hearing – suggested a more appropriate listing to use for comparison.

Plaintiff also contends the ALJ erred because the pricing clerk job is sedentary, and the ALJ found she could only sit for four hours in an eight hour day. The VE addressed this, providing a basis for the ALJ's conclusion Plaintiff could perform this job. R. at 934.

### III. CONCLUSION

The Commissioner's final decision is supported by substantial evidence in the Record as a whole, and it is therefore affirmed.
IT IS SO ORDERED.

                                                 /s/ Ortrie D. Smith
                                                 ORTRIE D. SMITH, JUDGE
DATE: April 16, 2009                         UNITED STATES DISTRICT COURT